IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MALINDA SUE LEWIS                )
                                 )
v.                               )        No. 2:10-0124
                                 )        Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION   )


To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under the Social Security Act.  The case is currently pending on plaintiff's motion for

judgment on the administrative record (Docket Entry No. 14), to which defendant has

responded (Docket Entry No. 21).[1]  Upon consideration of these papers and the transcript of

the administrative record (see Docket Entry No. 10),[2] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be DENIED and that the

decision of the SSA be AFFIRMED.

---

        [1]The undersigned notes that the last 2 ½ pages of defendant's brief appear to have been
mistakenly included in its filing, as they clearly relate to a different disability claimant.

        [2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her DIB and SSI applications on July 25, 2007, alleging disability beginning June 30, 2006, due to arthritis, chronic pain, tendonitis, and anxiety disorder. (Tr. 162)  After denials of these applications at both the initial and reconsideration stages of agency review, plaintiff filed a request for hearing before an Administrative Law Judge ("ALJ").  (Tr. 9)  The ALJ heard the case *de novo* on February 8, 2010.  (Tr. 45-85)  Plaintiff was represented by counsel at the hearing, and testimony was received from plaintiff and two witnesses on her behalf, in addition to a vocational expert who testified at the conclusion of the hearing.  After hearing the testimony of all witnesses, the ALJ adjourned the hearing and took the matter under advisement, until March 11, 2010, when he issued a written decision denying plaintiff's claims.  (Tr. 9-20)  That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

    The claimant has the following severe impairments:  bilateral pes planus of the feet; lumbar spine degenerative facet disease; alcoholism in alleged remission; bipolar disorder/depressive disorder/anxiety disorder; post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined

in 20 CFR 404.1567(b) and 416.967(b) except she should not do any more than occasional climbing, stooping, bending, crouching, crawling or kneeling; she can stand for up to four hours in an eight hour day, but should not be required to stand more than 30 minutes continuously. She has no specific limits on sitting. She can understand, remember and complete detailed tasks on a regular and continual basis with occasional difficulty sustaining concentration, persistence and pace. She is able to interact with small groups, one on one, and occasional or superficial, but not continual general public interaction. She can get along with supervisors and coworkers, with no major problems anticipated. She is able to adapt to routine, not frequent or fast-paced change. She can avoid major hazards and take most transportation independently for familiar travel. She is able to set and carry out most long-range goals with only occasional assistance.

5.    The claimant is capable of performing past relevant work as a candle maker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

6.    The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 11-14, 19-20)

On October 26, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id

## II.  Review of the Record

### A.  Medical Evidence

#### 1.  Physical Impairments

Plaintiff Malinda Lewis was born on February 25, 1972, and was nearing 38 years of age on the date of her hearing.  (Tr. 50)  She was born with deformities of her feet, for which her longtime treating internist, Dr. Kenneth L. Colburn, eventually referred her to specialty care.  On October 3, 2006, plaintiff presented to Dr. Colburn for her annual gynecological exam.  (Tr. 369)  She was noted to have had no significant changes in her health history since her last such exam 17 months prior.  Id.  Dr. Colburn noted that plaintiff had an odor of alcohol upon entering the examination room (Tr. 370), and further noted as follows:

> The patient drinks alcohol moderately and smokes.  She initially states she drinks a glass of wine per month, but on further questioning admits to having 2 Smirnoff Ice drinks last night.  The patient is divorced from her 2nd husband 8 months ago.  She states this was a very abusive relationship.  She is involved with a boyfriend currently.  The patient admits to abusing alcohol in the past, and as recently as 1 year ago, but denies overuse now.  She was actively involved with AA many years ago. ... [Patient] requests Xanax.  I expressed concern about her alcohol use despite her denial that this is a major problem at this time.  I encouraged her to reconnect with AA in its entirety.  I expressed discomfort with using Xanax in this situation.  Patient is tearful during discussion.

(Tr. 369, 372)

On referral from Dr. Colburn, Dr. Stephen J. Chapman, D.P.M., a podiatrist, saw plaintiff on three occasions during January and February of 2007, noting that "[s]he has a severely pes planus [right] foot and a rectus [left] foot."  (Tr. 332)  On February 22, 2007, she was noted to be somewhat improved with treatment, but still having a lot of pain.  Id.  She

4

had been taking the anti-inflammatory drug Feldene, which Dr. Chapman had prescribed at her first visit, and was given a therapeutic injection into her right foot. She utilized over-the-counter arch supports at Dr. Chapman's suggestion, but was advised on February 22 that she needed to be cast for custom orthosis, and would possibly need surgical intervention on her left foot. Id. No further treatment from Dr. Chapman appears on the record, evidently because he stopped accepting TennCare. (Tr. 414)

On April 13, 2007, plaintiff presented to Dr. Colburn's office complaining of right foot pain. (Tr. 414) She told Dr. Colburn that the constant pain interfered with her sleep and prevented her from bearing weight with the right leg, and that it was aggravated by walking or working around the house. Id. Dr. Colburn noted that plaintiff had very flat feet, but that musculoskeletal and neurologic examination results were normal. (Tr. 414-15) He diagnosed chronic foot pain, prescribed the muscle relaxant Flexeril and the narcotic Lortab for symptom relief, and ordered a podiatry consultation. (Tr. 415-16)

On May 2, 2007, plaintiff returned to Dr. Colburn's office having run out of medication, due to her confusion over how frequently she was to take the prescribed Lortab and Flexeril. (Tr. 417) She had not yet been given an appointment with the podiatrist consult, but had been wearing supportive shoes and had been on her feet a lot lately, reportedly due to moving and helping her mother. Id. Nurse practitioner Sherri DePriest diagnosed chronic pain in both feet related to foot deformities, adjusted plaintiff's prescriptions, and advised her to always wear supportive shoes with gel inserts, and to stay off her feet as much as possible. (Tr. 418-19)

On June 25, 2007, plaintiff was seen in Dr. Colburn's office with a complaint of nausea, vomiting, and diarrhea over the previous four days. (Tr. 422) She reported having

to spend her weekends serving time in the Putnam County Jail, and believed her symptoms were traceable to the bleach used in the jail.  Id.  She was given medication, which apparently resolved the issue.

On July 5, 2007, plaintiff was seen in consultation by podiatrist, Dr. Melvin Williams, D.P.M.   Dr. Williams diagnosed posterior tibial dysfunction, pes plano valgus, and pain and paresthesias, all in the right foot.  (Tr. 355)  Dr. Williams provided plaintiff with a foam-wedge night splint, and noted that she need to have chronic pain management, while also noting that plaintiff declined to pursue available surgical options "due to having young children and being single."  Id.  Dr. Colburn concurred with Dr. Williams' recommendation that plaintiff be referred to a pain management clinic.  (Tr. 428-29)

In August 2007, in conjunction with her intake at the Cumberland Back Pain Clinic, plaintiff submitted to a urine drug screen.  Results of this test were negative for hydrocodone, which was inconsistent with plaintiff's prescription for Lortab, and positive for oxycodone, which had not been prescribed to her.  (Tr. 462-65)

 In an initial questionnaire for the pain clinic dated August 15, 2007, plaintiff complained of severe, chronic pain in both feet, and identified the therapies she had failed prior to her referral to pain management.  (Tr. 459-61)  At her first office visit, on August 21, 2007, plaintiff repeated her report of a history of pain in both feet, and also reported a one-year history of lower back pain without radiation.  (Tr. 455)  Her examiner noted tenderness in her lumbar paraspinal muscles, and ordered film studies of her lumbar spine.  (Tr. 455-56)  Flexeril was prescribed to treat plaintiff's foot and back pain.  (Tr. 457)  When the x-ray and MRI results came back, no abnormalities were revealed on x-ray, but moderate degenerative facet disease at L5-S1 and mild disease at L4-5 were revealed on the MRI.  (Tr. 437-38)  In

September 2007, plaintiff reported that Flexeril really helped, and that trigger point injections also had helped; Percocet was added to her pain medication regimen. (Tr. 447-48)

On October 18, 2007, plaintiff was seen by Dr. Michael T. Cox, M.D., for a consultative physical examination at government expense. (Tr. 439-43) The history given to Dr. Cox by plaintiff included the following:

> The patient has had chronic lower back pain for 3 to 4 years. An MRI scan was done by the pain clinic in Cookeville to which she goes. She has degenerative disk disease on that MRI scan. Pain radiates [from] the lower back in[to] both legs as she notes at times her legs get weak. She has a pulling-type pain that emanates all the way from her lower back up into the neck. This worsens whenever she stands, stoops, squats, kneels or tries to lift anything. The patient also has bilateral wrist pain. This causes her to drop objects. Combination of these problems ha[s] precipitated her application for disability benefits.

(Tr. 439-40) On neurological exam, Dr. Cox found plaintiff fully oriented and neurologically intact, with equal reflexes and normal sensation, and further found as follows:

> Straight-leg raising test is negative, both in the lying and seated position. The patient is able to stand on her toes for brief periods of time. She can stand on her heels for a few seconds. She is able to squat and rise up with modest difficulty. The joints were free of any redness, warmth, synovitis or effusion. The patient has obvious flattened sole of the right foot with inversion of the right foot noted. She retains good motion of the right foot and ankle. In the lumbar spine, she is able to flex adequately to 90 degrees, extend 5 degrees, and left lateral flex to 15 degrees and right lateral flex 15 degrees. Other joints have normal range of motion. The patient has no gait disturbance.

(Tr. 441) Dr. Cox concluded his examination with the following functional assessment:

> Patient's disabilities do keep her from being able to stand for more than 30 minutes of time. She can stand for a total of 4 hours in an 8-hour workday with a break period every 30 minutes or so, not alternate sitting and standing. She can sit for 8 hours in an 8-hour workday with normal break periods. Patient is able to lift up to 5 pounds frequently, 20 pounds occasionally, being limited by the degenerative disk disease of the lumbar spine. She cannot do

lifting for more than a total of 2 hours in an 8-hour workday and probably can only lift for 15 minutes of time.  She is unable to use her legs in repetitive fashion due to the lower back pain.  She is unable to push or pull with her lower extremities more than 10 pounds....

(Tr. 442)

By November 26, 2007, plaintiff had been released from care at the pain clinic because of their decision to no longer accept TennCare.  (Tr. 446)

On December 28, 2007, plaintiff reported back to Dr. Colburn that she needed new pain prescriptions for her severe back and foot pain, stating that she had been "feeling quite well" on the Percocet and Kadian (morphine) the pain clinic had been prescribing for her.  (Tr. 552)  Dr. Colburn declined to prescribe more than one narcotic, but ordered Lorcet and Flexeril for plaintiff's pain.  (Tr. 553-54)  He noted that he would try to find a new pain clinic for plaintiff.  (Tr. 553)  Following an early January 2008 visit to Dr. Colburn for poison ivy contracted while plaintiff was doing yard work (Tr. 556-58), plaintiff's remaining treatment with Dr. Colburn during the relevant period was unrelated to her allegedly disabling conditions.  Plaintiff received subsequent pain management therapy through the office of Dr. Donald Boatright, M.D., with Medical Necessities, Inc.  (Tr. 498-525)

2.  <u>Mental Impairments</u>

Plaintiff presented to Dale Hollow Mental Health Center, a member of the Volunteer Behavioral Health Care System, for an initial assessment on October 17, 2006.  (Tr. 351-54)  She reported having problems coping with stressors including several outstanding DUIs, the removal of her three children from her custody, continued drinking, and difficulty accepting her treating physician's decision to take her off of Xanax, an anti-anxiety medication.  (Tr. 351)  She was referred to medical therapy and counseling after

8

being diagnosed with an anxiety disorder NOS (not otherwise specified), with a personality disorder to be ruled out. (Tr. 354) A Tennessee Clinically Related Group ("CRG") form completed that day rated plaintiff as mildly or moderately limited in all functional domains except "adaptation to change," where she was rated as extremely limited due to "no job, lost custody of kids, several DUIs." (Tr. 336-38) Her medication was initially managed by Dr. Chip Fountain (Tr. 348-50), but she was seen by advanced practice nurse Angela Wentworth in May 2007. At that time she reported serving jail time related to her DUIs on the weekends, but having had her children returned to her custody during the week, with the Department of Children's Services ("DCS") still involved in her home. (Tr. 342) Her focus with Nurse Wentworth was getting a prescription for Xanax, and she became tearful when she failed to convince Nurse Wentworth to write the prescription. (Tr. 342-43) By July 5, 2007, plaintiff reported to Nurse Wentworth that she only had one more weekend of jail time to serve, and that DCS was no longer involved in her home. (Tr. 345) After reporting good results with mood stability using Zyprexa, plaintiff was continued on that medication, as well as an increased dose of Zoloft. (Tr. 346) Nurse Wentworth's diagnoses at that time were alcohol dependence (though plaintiff was noted to be "sober since November, 2006"), alcohol-induced anxiety disorder, mood disorder NOS, and psychotic disorder NOS, with personality disorder to be ruled out. Id.

On October 19, 2007, plaintiff presented at Dale Hollow complaining that she was on the verge of a nervous breakdown. (Tr. 598) Advanced Practice Nurse Melanie Cowell increased her dosage of Zyprexa and referred her back to therapy with Nurse Wentworth. (Tr. 599) An updated CRG assessment was completed that day, rating plaintiff as moderately limited in all functional domains except "adaptation to change," where she

was rated as markedly limited due to "stress/change increases anxiety - minimal coping skills." (Tr. 602-04)  At her next appointment, on November 16, 2007, plaintiff reported doing "much better" because she was "not having a nervous breakdown anymore."  (Tr. 613) Her medications were maintained at this visit and the subsequent visit in January 2008.  (Tr. 614-17)

On January 9, 2008, plaintiff presented for a consultative psychological evaluation at government expense, performed by Senior Psychological Examiner Jerell F. Killian, MS.  (Tr. 474-78)  Mr. Killian noted that plaintiff "moved about with unrestricted mobility, ... exhibited no physical limitations for this session[, and] [s]he utilized her hands and arms freely as she manipulated materials[.]"  (Tr. 474)  Plaintiff reported having a difficult time coping, with brief periods of racing thoughts and high energy, while at other times feeling lethargic and being negligent in caring for herself and her responsibilities.  (Tr. 475)  Good results were obtained on mental status examination.  (Tr. 475-76)  Concerning plaintiff's daily activities, Mr. Killian reported as follows:

> Ms. Lewis stated she generally manages self-care but has to have help with homemaking activities due to problems with both her hands and her feet.  She stated for example her children have to help with cooking because of her difficulty grasping.  She indicated she maintains executive activities fairly well although she frequently misses appointments, fails to pay bills on time, take medications as prescribed, etc., unless reminded.
>
> She has a driver's license and drives short distances.  For example, she sometimes runs errands, and she drives herself to and from physical therapy where she is going twice a week.  She is also active in church.  She stated she is involved in a "Mission and Bible Study" and church related activities for the community.  She also volunteers at school, helping children for example with crafts in the classroom.

(Tr. 476)  In his functional assessment, Mr. Killian opined as follows:

There were no hints of resistance, bu the validity of the information provided by Ms. Lewis is uncertain. She stated today for example she has had four "nervous breakdowns" while she indicated in the "Function Report - Adult" that she has had two.

Based on the information she provided and her presentation during this session my impression is she suffers from Bipolar II, and personality may be an issue. She described some problems with memory and concentration but demonstrated no cognitive limitations during this session and she is apparently able to maintain a high level of functioning in some areas, such as the church activities and volunteer work at school. She relates in a pleasant, socially acceptable manner. The primary issue seems to be adaptability but is clouded by the history of alcoholism, ongoing situational difficulties and personality.

(Tr. 476-77)

At her medical management visit to Dale Hollow, in March 2008, plaintiff reported chronic stomach pain and increased "emotionalism, crying at the drop of a hat," as well as changes in her menstrual symptoms (Tr. 618) Dr. Lana Davenport ordered a medication change from Zoloft to Cymbalta, and recommended that plaintiff follow up soon with her obstetrician/gynecologist, as her symptoms suggested a gynecological disorder. (Tr. 619) In April 2008, plaintiff was seen by a new therapist at Dale Hollow, who reported that she was extremely emotional and tearful, but that the current level of therapy being provided was expected to be effective in resolving her symptoms. (Tr. 621-22) At a crisis assessment in May 2008, plaintiff was tearful to the point of being inconsolable, and could not complete the assessment due to suffering a panic attack. (Tr. 624-30) In June 2008, plaintiff reported significant depression, not sleeping well, and having flashbacks and nightmares of past trauma; her therapeutic regime was continued. (Tr. 631)

From October 2008 until August 2009, plaintiff received counseling and medical management from Nurse Wentworth and other professionals at Lifecare Family

Services. (Tr. 653-76) Her treatment there was encapsulated by Nurse Wentworth's responses to the "Mental Health Questionnaire" provided her by plaintiff's attorney. (Tr. 677-78) That document, dated October 1, 2009, contains Nurse Wentworth's opinions that plaintiff's ongoing mood lability and difficulties with interpersonal relationships leave her with marked functional limitations that would satisfy corresponding disability criteria, and would cause more than four absences from work per month.

B. <u>Testimonial Evidence</u>

The ALJ summarized the hearing testimony as follows:

At the hearing, the claimant said that she had been sober since she had lost her driver's license in 2005 due to a DUI (driving under the influence of alcohol or drugs) charge. She related that she had been raped in her house with her children there, and that due to the trauma, she had gone out drinking for two days. She said that she was going to obtain a driver's license the day after the hearing. She said that when she last worked, she was self-employed making candles, and that she quit working because when she was raped, she "just shut down and quit doing everything." She said that she was unable to physically or mentally "get into" the candle-making any more. She said that her feet hurt so bad that she could not stand and that she had had problems with her feet since birth. She said that, for her feet, she used inserts, a night brace, and a cane. She related that she wore special-made shoes. She said that "they" could do nothing more for her feet. She said that she went to mental health for treatment after the rape and that she had been seeing a counseling three to four times a week. She said that she was still in counseling with Lifecare services, and that she took medications for depression, Paxil and Abilify; and that she recently quit taking Wellbutrin, which she had been taking for years. She said that she also had had bipolar disorder throughout her adulthood, and that she had suffered with anxiety disorder and panic disorder for 25 years. She said that she did not sleep well, primarily due to physical problems. She said that her feet bothered her a lot when she slept; and that carpal tunnel and a right knee problem also interfered with her sleep. She said that her right knee was "blown out" and had been a problem for the last couple of years. She said that she had ordered a knee brace recently and that she had been in physical medicine treatment for her knee for the last year and a half, which

included massage, hot packs and cold packs. She said that a possibility of injecting cartilage into her knee had been discussed. She said that she had had problems with carpal tunnel syndrome in both of her hands since 1999, for which she had undergone therapy but no surgery. She said that she had had lower back problems in the Ll/L2 area with pain since 2006/2007; that she had degenerative discs and that it was "ate up with arthritis." She said that her primary doctor treated her for this problem and performed physical medicine treatment as well. She said that this (therapy) included treatment for her back; that included lying on a massage table and in/on a heated chair. She said that she had worn a back brace for the past two years. She said that she used to plant flowers and had a garden, but that she had stopped doing this in 2005/2006. She said it was hard for her to sit in the seats at church; that she did no regular exercise, as her feet would not allow her to walk. She said that her tailbone had been broken in the late 1990's, approximately 1998 or 1999, and that she shifted "a lot" while sitting. She said that she could only sit for 15 to 20 minutes; that she was up and down a lot and could not stand for very long; walk no more than five minutes; that she usually used a cane when she walked; and that it was hard for her to lift five pounds. She said that she had had thoughts of suicide after the rape. She said that she had a lot of crying spells and that she did not leave the house very often. She said that she became tired and drowsy from the pain medications, and that she did not want to get up sometimes. She said that it was hard for her to keep track of her medications, and she would run out of medications. She said that she had gaps in her coverage with TennCare because she was only allowed to get five medications.

Cindy Hodge testified that she was the case manager for the claimant's son, and that she had known the claimant for three years. She said that the claimant's son was also with Lifecare. She said that she saw Ms. Lewis twice a week during the course of monitoring her son for attention deficit hyperactivity disorder (ADHD). She said that she had a bachelor's degree in Criminal Justice and that she had been doing counseling with families for 30 years, but that she was not a therapist. She said that when she saw Melinda, one time she would be happy and talkative and the next time, she may be crying and sobbing for no apparent reason, and that she would cry for an hour to an hour and a half. She said that she observed the claimant crying about three times a month. She said that she had seen the claimant have panic attacks, and that she could tell when the claimant was low on medication or did not have her medications, and that at those times, she had high or low

moods.  Ms. Hodge said that the claimant was unable to socially function, as she did not go out of the house much due to her physical and mental state. She said the claimant relied on her husband for a lot of decisions, and that the claimant really had to think to make a decision.

Charley Deck testified that he was the claimant's next-door neighbor, and that he had known her for eight to ten years.  He said that he saw her about every week when she was out or he visited them.  He said that he knew that the claimant had really bad feet, and a lot of times, she had to use a cane, especially on uneven ground.  He said that she had mental problems that incapacitated her; that she had "crying fits"; and that she cried for days on end. He said that this was the way that his wife cried, and that his wife had the same problem as the claimant.  He said that Ms. Lewis cried so many times over the years that he could not count them all; that most of the time, she was on the couch when he had seen her crying, but that he had also seen her "just walking around sobbing" when she was in the yard.  He said that neither the claimant nor her husband drove.  He said that he did not remember how long it had been since the claimant's husband had driven, but he thought that it had been a matter of years.  He said that when she was having a good day, she would sometimes ask him to drive her to the grocery store.  He said that she would either call somebody else to take her to the grocery store, or he would take her there.  Mr. Deck said that the claimant had had these problems for as long as he had known her, about eight to ten years.  Mr. Deck indicated that he had been disabled for about two years.

(Tr. 14-16)

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007)(quoting <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be

found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

490 (6th Cir. 1988).

## C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erroneously failed to consider whether her congenital foot impairment is the medical equivalent of the impairment described in Listing 1.02. She further argues that the ALJ erred in finding her capable of performing a reduced range of light work, including her past relevant work as a candlemaker, in light of her severe degenerative disc disease. Finally, plaintiff argues that the ALJ erred in failing to consider certain "other source" evidence of her mental impairments, as he was obliged to do in accordance with Social Security Ruling 06-03p. For the reasons given below, the undersigned finds no merit in these arguments, and recommends that the ALJ's decision be affirmed.

In considering plaintiff's case at step three of the sequential evaluation process, the ALJ found, in pertinent part, as follows: "On reviewing the claimant's medical records as well as provisions of listed impairments, the undersigned does not find a degree of severity consistent with the criteria associated with a musculoskeletal impairment." (Tr. 12) Plaintiff contends that this finding is not substantially supported, inasmuch as her "severely pes planus [right] foot" and "rectus [left] foot" with associated pain on weightbearing (Tr. 332) are equivalent in severity to the criteria of Listing 1.02. That listing describes "Major dysfunction of a joint(s) (due to any cause)," as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

17

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

In turn, section 1.00B2b generally defines "inability to ambulate effectively" as:

... having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. ... Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 et seq.

In order to meet or medically equal a listing, all the criteria of the listing must be established in the medical evidence, or fairly represented by comparable, documented findings of equal medical severity.  See Sullivan v. Zebley, 493 U.S. 521, 531 (1990).  As noted in defendant's brief, even assuming *arguendo* that plaintiff's foot deformity is the medical equivalent of the joint impairment described in the prefatory language of Listing 1.02, her argument for reversal hinges upon her alleged inability to ambulate effectively because she often has to use a cane, and so fails on its own terms.  As recited above, ineffective ambulation by definition requires that both upper extremities be occupied by the necessary hand-held assistive device.  Therefore, plaintiff's need of only one cane to assist in walking does not equal in severity the limited function described in Listing 1.02A.

Accordingly, substantial evidence supports the ALJ's step three finding of no listing-level musculoskeletal impairment.

Plaintiff next argues that "[b]ecause of [her] severe degenerative disc disease she cannot perform the lifting requirements of light work[,]" and that the ALJ's adoption of all restrictions assessed by consulting examiner Dr. Cox *except* such light-work-prohibitive lifting restrictions is in error, rendering his finding of plaintiff's RFC for light work unsupported and subject to reversal.  (Docket Entry No. 15 at 10-12)  The ALJ found as follows with respect to the opinion of Dr. Cox:

> The opinion of Dr. Cox, the physician who consultatively examined the claimant in October 2007, is given considerable weight, except those portions with respect to the limitations in lifting and in pushing/pulling with the claimant's lower extremities.  With the exception of the latter-mentioned limitations, Dr. Cox's opinion is generally consistent with the overall evidence of record, including treatment notes, clinical findings, and objective diagnostic test results.  However, the limitations in lifting and in pushing/pulling with the lower extremities opined by Dr. Cox are given no weight, as they are inconsistent with the overall evidence of record, including his own examination findings, which were generally benign.

(Tr. 18)

As noted by defendant, plaintiff appears to be aligning herself with Dr. Cox for purposes of this argument.  Had the ALJ rejected a portion of Dr. Cox's (or any physician's) assessment *solely* because the limitations assessed were inconsistent with the physician's examination findings, the undersigned would agree that this would likely constitute an improper substitution of the ALJ's lay judgment for the medical judgment of the physician.  However, as quoted above, the ALJ in this case rejected Dr. Cox's assessment of plaintiff's

lifting limitations because it was inconsistent with the record as a whole, in addition to the perceived inconsistency with examination results. The record as a whole was discussed thoroughly by the ALJ, vis-à-vis the credibility of plaintiff's subjective complaints of disabling limitations due to physical pain and mental health symptoms (Tr. 16-18),[3] yielding findings which have gone unchallenged in this court.

Ultimately, however, the argument for reversal based upon the ALJ's finding

---

[3]The following excerpt is illustrative:

Records show that except for a mention to her podiatrist in January 2007 that her back was bothering her, she does not appear to have complained of, or sought any treatment for back pain until [she] saw a pain management specialist in September 2007, upon referral by Dr. Colburn. As a matter of fact, clinical records from Dr. Colburn indicate that during office visits between October 2006 and September 2007, the claimant consistently denied experiencing any joint or muscle pain. Physical examination findings have also not shown the type of abnormalities one would expect, given her allegations. For instance, when Dr. Colburn examined the claimant in April 2007, the physician noted that the claimant had normal strength, normal muscle tone; no atrophy in the lower extremities bilaterally; and normal range of motion in the bilateral lower extremities, though she complained of pain with motion of her foot.
. . .
[I]n May 2007, Dr. Colburn indicated that the claimant reported that she had been moving and helping her mother, so she had been on her feet a lot lately. In a questionnaire that she completed in September 2007, the claimant's mother indicated that the claimant attended her children's sporting events. During a consultative psychological evaluation performed in January 2008, the claimant told the examiner, Mr. Killian, that she performed volunteer activities at school, such as helping children with crafts in the classroom; that she was active in church activities; that she was involved in a "Mission and Bible Study" and church-related activities for the community. When Ms. Lewis underwent a diagnostic psychological interview in October 2008, she reported that her hobbies included going to the lake, watching movies, having family dinner together; and that she loved to cook. In August 2009, the claimant told her mental health clinician that she was experiencing increased foot pain due to walking and riding a bicycle due to the family not having a vehicle at that time.

(Tr. 16, 18)

of plaintiff's RFC for a range of light work is undone by the alternative finding of the ALJ, which would appear to encompass the whole of Dr. Cox's assessment, and is supported by the testimony of the vocational expert:  "The undersigned finds that even if the claimant was restricted to a reduced range of sedentary work which included the previously-cited limitations [identified by Dr. Cox and Dr. Welch], based on the vocational expert's testimony, there would be a significant number of [] jobs that the claimant could still do." (Tr. 20; <u>see also</u> Tr. 83-84)  Substantial evidence on the record as a whole supports the ALJ's finding of plaintiff's RFC for a reduced range of light or, alternatively, sedentary work.

Finally, plaintiff argues that the ALJ erred in failing to consider the Tennessee Clinically Related Group ("CRG") assessment forms included in the evidence of plaintiff's mental health treatment at Dale Hollow Mental Health Center.  Specifically, she contends that Social Security Ruling ("SSR") 06-03p requires that appropriate weight be given to opinion evidence from "other sources" such as CRG raters; that the CRG form completed by Dr. Sherrie Foster, Ed.D.,[4] on October 17, 2006, portrays an individual disabled by her mental impairments; and, that the absence of any indication in the ALJ's decision that he considered and rejected the opinions contained in the CRG form amounts to reversible error, citing <u>Butterman v. Astrue</u>, 2009 WL 530121, at *6 (S.D. Ohio Feb. 27, 2009).  (Docket Entry No. 15 at 13)

Regarding Dr. Foster's opinion of plaintiff's functional ability on October 17,

---

[4]While this individual is referred to on the CRG form simply as Sherrie Foster (Tr. 338), her qualification as a Doctor of Education is revealed in the lone treatment note bearing her name (Tr. 354), which appears to be the initial assessment of plaintiff as a client with Volunteer Behavioral Health Care System.  (Tr. 351-54)  The date of that initial assessment, October 17, 2006, is the same date that is given for the initial CRG assessment by Dr. Foster.  (Tr. 338)

2006, while the CRG form did reflect, *inter alia*, plaintiff's "extreme" limitation in the ability to adapt to change, the circumstances giving rise to that rating were identified as "no job, lost custody of kids, several DUIs[.]" (Tr. 337)  This corresponds with Dr. Foster's treatment note, which states that plaintiff's children had at that time been removed from her custody, and which also states that plaintiff had "several outstanding DUIs" (Tr. 354) and "cannot accept that [primary care physician] has taken her off xanax after 8 yrs. … Wants [prescription] for xanax restored." (Tr. 351)  Indeed, as noted by the ALJ (Tr. 17), two weeks earlier, on October 3, 2006, Dr. Colburn had declined plaintiff's request for renewal of her Xanax prescription in light of his concern with the combination of that drug and plaintiff's apparent alcohol abuse. (Tr. 369-72)  However, by May 2007 plaintiff's children had been returned to her custody (Tr. 342), and she was subsequently noted to have been sober since November 2006 (e.g., Tr. 599).  Given this change in circumstances following plaintiff's initial visit for mental health treatment in October 2006, it would not appear that Dr. Foster's rating of plaintiff's functioning on the CRG form would support a finding of disability (i.e., inability to work "which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A)), as plaintiff contends.

In determining plaintiff's mental RFC, the ALJ ultimately adopted the assessment of the nonexamining state agency consultant, Dr. Welch, who opined, *inter alia*, that plaintiff "is able to adapt to routine, not frequent or fast-paced change." (Tr. 14, 638)  In so doing, the ALJ did not explicitly consider the CRG assessment of Dr. Foster.  While the Butterman court followed the lead of "[o]ther courts [which] have required a remand when no reasons are given for rejecting other evidence which, if believed, would lead to a finding

of disability," 2009 WL 530121, at *6, it is not apparent that Dr. Foster's CRG assessment

would lead to such a finding, as noted above. Moreover, SSR 06-03p does not require ALJs to

give explicit attention to every shred of opinion evidence, as detailed below:

> Although there is a distinction between what an adjudicator must consider
> and what the adjudicator must explain in the disability determination or
> decision, the adjudicator generally should explain the weight given to opinions
> from these "other sources," or otherwise ensure that the discussion of the
> evidence in the determination or decision allows a claimant or subsequent
> reviewer to follow the adjudicator's reasoning, when such opinions may have
> an effect on the outcome of the case. In addition, when an adjudicator
> determines that an opinion from such a source is entitled to greater weight
> than a medical opinion from a treating source, the adjudicator must explain
> the reasons in the notice of decision....

2006 WL 2329939, at *6. Thus, ALJs should make explicit their consideration of "other

source" evidence, if not the actual weight such evidence is given, where that evidence could

potentially sway the ultimate determination of the claimant's case toward a finding of

disability. Conversely, the ALJ *must* explain his or her weighing of such evidence in cases

where the evidence is held to outweigh a treating source's medical opinion, as evidence of

the claimant's ability to perform work.

In this case, Dr. Foster's CRG assessment, based on an intake session with

plaintiff when she was at a relative nadir of mental functioning due to transient stressors,

cannot be viewed as potentially outcome determinative. Accordingly, the ALJ's failure to

mention his consideration of this evidence was not in error. Alternatively, any error in this

regard is harmless, as the ALJ did explain his rejection of the more restrictive opinion of

nurse practitioner Angela Wentworth, an "other source" who had a much more extensive

relationship with plaintiff, and whose opinion would have an effect on the outcome of the

case. (Tr. 18-19) A factor which weighed in the consideration of Ms. Wentworth's opinion, and which otherwise loomed large in the ALJ's consideration of the record as a whole, is his clear conviction that plaintiff was not truthful with her treating providers, nor otherwise credible in her presentation as a person disabled by her physical pain and emotional disturbances. (Tr. 16-18) This credibility finding is not directly challenged in this court,[5] nor would any such challenge appear to be fruitful, in light of the numerous inconsistencies in the record and the significant deference due an ALJ's credibility finding. See, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). In light of the thorough analysis which was provided in the ALJ's decision, the undersigned finds that decision legally sufficient and supported by substantial evidence on the record as a whole.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections

---

[5]In the statement of facts section of her brief, plaintiff asserts that "the ALJ was unjustly critical of Ms. Lewis" when he erroneously noted that "there is no mention in any of the medical records in evidence that the claimant reported having been raped until May 2008, which is totally inconsistent with her hearing testimony." (Docket Entry No. 15 at 5 (quoting Tr. 21)) The ALJ was in error on the matter of plaintiff's timely complaints of having been raped; nevertheless, the record plainly contains substantial evidence in support of his adverse credibility finding.

filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

        **ENTERED** this 1st day of February, 2012.

                                                      s/ John S. Bryant_____
                                                     JOHN S. BRYANT
                                                     UNITED STATES MAGISTRATE JUDGE